UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION, as Trustee for MERRILL LYNCH FIRST FRANKLIN MORTGAGE LOAN TRUST, SERIES 2007-4,<br><br>Plaintiff,<br><br>-against-<br><br>FIRST FRANKLIN FINANCIAL CORPORATION, MERRILL LYNCH MORTGAGE LENDING, INC., and BANK OF AMERICA CORPORATION,<br><br>Defendants. | 1:19-cv-5948<br><br>**COMPLAINT** |

U.S. Bank National Association ("Plaintiff," "U.S. Bank," or the "Trustee"), in its capacity as Trustee of the Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-4 ("FFMER 2007-4" or the "Trust"), by its attorneys, McKool Smith, P.C., for its Complaint herein against First Franklin Financial Corporation ("First Franklin"), Merrill Lynch Mortgage Lending, Inc. ("MLML"), and Bank of America Corporation ("BAC" and, together with First Franklin and MLML, "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1.      This is an action for breach of contract arising from each of First Franklin's and MLML's (each a "Seller" and collectively, the "Sellers") willful failure to abide by its contractual obligations relating to a securitized pool of approximately 7,600 mortgage loans (the "Mortgage Loans" or "Loans"), with an aggregate outstanding principal balance of approximately $1.6 billion, which were conveyed to the Trust pursuant to a Pooling and Servicing Agreement, dated as of June 1, 2007 (the "PSA").

2.      The PSA established the Trust and empowered the Trustee to enforce the Sellers' contractual obligations regarding the Mortgage Loans.  Defendants First Franklin, MLML, and

BAC are liable for the Sellers' breaches because they are each successors-in-interest to and/or "alter egos" of each other.

3.     First Franklin was an originator of residential mortgage loans.  In 2006, First Franklin was acquired by Merrill Lynch & Co, Inc. ("ML"), as part of ML's efforts to create a vertically-integrated operation for the securitization of residential mortgage-backed securities ("RMBS").  In furtherance of ML's efforts to increase its RMBS market share, First Franklin sponsored the FFMER 2007-4 securitization and sold certain of the Mortgage Loans that were securitized in the Trust.

4.     MLML is a wholly owned subsidiary of ML and is part of ML's RMBS operation.  During the relevant timeframe, MLML sponsored RMBS issued and marketed by ML and also purchased or otherwise acquired mortgage loans for the purpose of securitizing those loans into RMBS, including certain of the Mortgage Loans securitized in the FFMER 2007-4 Trust.

5.     Pursuant to a Mortgage Loan Purchase Agreement dated as of June 1, 2007 (the "First Franklin Purchase Agreement"), First Franklin sold certain of the Mortgage Loans to another ML subsidiary (and therefore an MLML affiliate), Merrill Lynch Mortgage Investors, Inc. ("MLMI").  MLMI acted as the securitization's "Depositor."

6.     In a separate Mortgage Loan Purchase Agreement dated as of June 1, 2007, MLML also sold certain of the Mortgage Loans to the Depositor (the "MLML Purchase Agreement" and, together with the First Franklin Purchase Agreement, the "Purchase Agreements").

7.     Pursuant to each of the Purchase Agreements, the Sellers made numerous representations and warranties regarding the nature and quality of the Mortgage Loans that were

securitized in the Trust (the "Mortgage Warranties"), including representations that, among other things, each Mortgage Loan complied with all applicable local, state, and federal laws; each Mortgage Loan was underwritten in accordance with the Seller's underwriting guidelines in effect at the time the Mortgage Loan was originated; and the information with respect to each Mortgage Loan on the Final Mortgage Loan Schedule is complete, true, and correct.  The Mortgage Warranties were meant to assure eventual investors in FFMER 2007-4 that the Mortgage Loans securitized in the Trust were of a certain quality.

8.      The Sellers agreed in the Purchase Agreements that if a Loan breached a Mortgage Warranty and such breach materially and adversely affected the value of the Mortgage Loan or the Mortgage Loans, the Seller would cure such breach or repurchase the Loan within 60 days of the earlier of discovering or receiving notice of the breach.

9.      The Sellers also assigned the Depositor all right, title, and interest in the Mortgage Loans.  The Depositor, in turn, conveyed to the Trustee pursuant to the PSA certain of its rights with respect to the Loans, including MLMI's right to enforce the Mortgage Warranties against each Seller.  The PSA empowered the Trustee to enforce those rights for the benefit of the Trust and the holders of the certificates issued by the Trust (the "Certificateholders").

10.     Indeed, the PSA provided the Trustee with the right to enforce each Seller's contractual obligations to repurchase Mortgage Loans where a Loan breached a Mortgage Warranty and such breach materially and adversely affected the value of the Mortgage Loan, Prepayment Charges, or the interests of FFMER 2007-4's certificateholders (a "Defective Loan").  And the PSA provides that the Seller would cure such breach or repurchase the Defective Loan within, at most, 90 days of the earlier of discovering or receiving notice of the breach (the "Cure/Repurchase Obligation").  This Cure/Repurchase Obligation was meant to

assure potential investors in FFMER 2007-4 that the Sellers had assumed and retained the risk with respect to any materially non-conforming Loans.

11.     The Mortgage Warranties and Cure/Repurchase Obligation were of particular importance to FFMER 2007-4 Certificateholders because, as Defendants knew, the Trust and potential Certificateholders did not have the ability (and were not required) to conduct any meaningful due diligence regarding the quality of the Loans.

12.     As a matter of law, MLML, BAC, and First Franklin are liable for the Sellers' Cure/Repurchase Obligation and other contractual obligations because they are successors-in-interest and/or alter egos of each other.

13.     By the time of origination or thereafter, each of the Defendants had discovered Defective Loans among the Mortgage Loans, but, in breach of their obligations, Defendants failed to notify the Trustee of those Defective Loans.

14.     Post-securitization investigations into the Mortgage Loans by Certificateholders indicated that thousands of the Mortgage Loans do not comply with one or more of the Mortgage Warranties and that those breaches of the Mortgage Warranties materially and adversely affected the value of the Mortgage Loans at the time of their sale to the Trust and thereafter.

15.     Upon learning from Certificateholders of the existence of the Defective Loans, the Trustee promptly served notices on the Defendants (among other parties) demanding they comply with the Cure/Repurchase Obligation (the "Pre-Complaint Breach Notices").

16.     In response to certain of the Trustee's Pre-Complaint Breach Notices, some loans were repurchased, though the overwhelming majority of the Defective Loans have been neither cured nor repurchased.

17.     On information and belief, based upon the results of the Certificateholders'
investigations, additional investigation, including a re-underwriting of the Mortgage Loan files
and an analysis of the documents contained (or missing) therein, will reveal substantial
additional evidence of breaches throughout the Trust's Mortgage Loans.  Indeed, the U.S.
Department of Justice ("DOJ") found—and, after BAC had acquired ML and its MLML, MLMI,
and First Franklin subsidiaries, BAC acknowledged on their behalf that—around the time this
Trust was securitized, MLML had securitized into trusts substantial numbers of loans originated
that MLML knew contained severe underwriting and compliance issues, including loans
originated by First Franklin.[1]  Based upon all of the foregoing, including the fact that First
Franklin and MLML originated or otherwise acquired the Loans that were securitized in the
Trust, on information and belief, breaches of Mortgage Warranties and document defects are
likely pervasive throughout the Mortgage Loans securitized in the Trust and result from each of
First Franklin's and MLML's gross negligence, and there are likely thousands of Defective
Loans, beyond those already specifically identified.

18.     The Trustee is authorized to enforce the Mortgage Warranties and now seeks to
compel Defendants to specifically perform the contractual obligations, including each Seller's
obligation to repurchase, or otherwise compensate the Trust for, each Defective Loan, including
those identified in the Pre-Complaint Breach Notices, those that any of Defendants otherwise
discovered, and any other Defective Loans to be identified.  The Trust is also entitled to damages

---

[1]    *See* Statement of Facts, *available at*
https://www.justice.gov/iso/opa/resources/4312014829141220799708.pdf (the "Statement of
Facts").  To settle DOJ claims concerning their marketing and structuring of RMBS, including
the securities that underlie the Trust, BAC, Bank of America N.A., and Banc of America
Mortgage Securities as well as their current and former subsidiaries and affiliates (collectively,
"Bank of America") agreed to the Statement of Facts on behalf of themselves and their current
and former subsidiaries and affiliates, including ML and, *inter alia*, ML subsidiaries MLML,
MLMI, and First Franklin.

for Defendants' failure to comply with the PSA, the Purchase Agreements, and the related Trust

Agreements (defined below).

## PARTIES

19.     Plaintiff U.S. Bank National Association is a federally-chartered national banking

association organized and existing under the laws of the United States that, pursuant to 12 U.S.C.

§ 22, has designated a Cincinnati, Ohio address as its "main office."  U.S. Bank serves as Trustee

of the FFMER 2007-4 Trust and appears herein solely in its capacity as Trustee on behalf of the

Trust.

20.     Defendant First Franklin Financial Corporation is a Delaware corporation that

maintains its principal place of business in Simi Valley, California.  On information and belief,

in or around 2006, at ML's direction, an ML subsidiary, Merrill Lynch Bank and Trust Co., FSB

("MLB&T"), acquired First Franklin.  In or around 2008, MLB&T transferred First Franklin's

stock to another ML subsidiary, Merrill Lynch Mortgage Services Corporation ("MLMSC").

21.     Defendant Merrill Lynch Mortgage Lending, Inc. is a Delaware corporation that

maintains its principal place of business in New York, New York.  On information and belief,

MLML is a subsidiary of ML.

22.     Defendant Bank of America Corporation is a Delaware corporation that maintains

its principal place of business in Charlotte, North Carolina.  On information and belief, in or

around 2009, BAC acquired ML and, *inter alia*, ML subsidiaries MLML, MLMI, and First

Franklin, and BAC has operated all four continuously since that date.

## JURISDICTION AND VENUE

23.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because Plaintiff is diverse of citizenship from all Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

24.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants are residents of this judicial district and because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district.

## FACTUAL BACKGROUND

### I.    MORTGAGE-BACKED SECURITIZATIONS

25.    Asset-backed securitization involves pooling cash-producing financial assets and issuing securities backed by those pools of assets.  In a residential mortgage-backed securitization, the cash-producing financial assets are residential mortgage loans, and the securities are called RMBS.

26.    In the most common form of residential mortgage-backed securitization, an entity known as a "sponsor" first acquires or originates mortgage loans.  The sponsor then creates a "depositor," which is typically a bankruptcy-remote special purpose entity, and the sponsor, depositor, and others establish a trust pursuant to a pooling and servicing agreement or trust indenture.  The sponsor typically transfers the mortgage loans to the trust in a two-step process by which (i) the sponsor first sells the loans to the depositor and (ii) the depositor then deposits the assets into the trust.  Pursuant to a registration statement filed with the SEC—including a prospectus that describes the general structure of the investment and prospectus supplements that are supposed to describe the mortgage loan collateral—the trust then issues certificates, or RMBS, that are backed by the mortgage loans in the trust in exchange for the loans deposited.

RMBS trusts often issue different tranches of RMBS certificates to meet different investor objectives.

27.     Underwriters typically purchase the RMBS trust's certificates and then offer, sell, or distribute the certificates to investors.  The trust uses the cash from its sale of certificates to the underwriters to pay for the purchase of the mortgage loans in the trust.  Investors that purchase the certificates are then paid principal and interest derived from a share of the principal and interest payments generated by the mortgage loans in the trust.

28.     RMBS sponsors and/or underwriters typically retain credit rating agencies to assign ratings to the different RMBS tranches prior to issuance.  Each credit rating agency employs its own scale with letter designations to describe various levels of risk, but, in general, AAA or its equivalent ratings are at the top of the credit rating scale and are intended to designate the safest investments.  In contrast, C and D ratings are at the bottom of the scale and refer to investments that are currently in or almost in default and exhibit little or no prospect for principal recovery from losses.

29.     To obtain credit ratings for the different tranches of an RMBS trust, the RMBS sponsor and/or underwriters provide the credit rating agencies with information about the pool of mortgage loans underlying the RMBS trust.  Credit rating agencies first analyze this information to determine the losses likely to be suffered by that pool.  To assign ratings for each tranche within the RMBS trust, the credit rating agencies then analyze how the expected losses within the pool of mortgage loans are likely to be suffered by each tranche, based upon the structure of the RMBS trust and its credit enhancements, such as "subordination," "overcollateralization," and "excess spread."  All other things being equal, to the extent credit rating agencies deem the loans in a trust more likely to incur losses, the agencies are more likely to determine that the

senior tranches would need higher levels of credit enhancement, including greater subordination relative to junior tranches, to ensure payment to senior certificateholders and justify a AAA rating or its equivalent.  In contrast, all other things being equal, to the extent credit rating agencies deem the loans in a trust less likely to incur losses, the agencies are more likely to determine that the senior, AAA tranches would need lower levels of credit enhancement (*e.g.*, less subordination from junior tranches) to ensure payment to senior certificateholders and justify a rating of AAA or its equivalent.  Accordingly, the size of the AAA tranche relative to the other tranches depends upon the quality of the loans in the underlying collateral group and the entire securitization.

30.     As a general matter, certificateholders do not have access to the loan files prior to the securitization of the loans in a trust.  Instead, certificateholders rely upon the representations and warranties, such as the Mortgage Warranties made in the Purchase Agreement, and the disclosures made in the offering materials.

## II.     THE FFMER 2007-4 SECURITIZATION

31.     The FFMER 2007-4 securitization closed on June 26, 2007 and was effectuated through the process generally described in paragraphs 25-30, with First Franklin as Sponsor and Seller and with MLML as Seller each transferring the Mortgage Loans to the Depositor for their securitization into the Trust.  As BAC admitted in the Statement of Facts, after ML acquired First Franklin in 2006, ML vertically integrated its RMBS securitizations using various of its subsidiaries, including First Franklin; Merrill Lynch Mortgage Capital; MLML; MLMI; Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS"); and Home Loan Services, Inc. ("Home

Loan").[2]  Consistent with this admission, in FFMER 2007-4, First Franklin and MLML each originated or otherwise acquired the underlying Mortgage Loans; First Franklin was the Sponsor of the securitization; MLMI was the Depositor; MLPFS was its lead underwriter; and Home Loan was its servicer.

32.     First Franklin conveyed certain of the Loans to MLMI, pursuant to the First Franklin Purchase Agreement.  A true and correct copy of the First Franklin Purchase Agreement is attached hereto as Exhibit 1.

33.     MLML conveyed certain of the Loans to MLMI, pursuant to the MLML Purchase Agreement.  A true and correct copy of the MLML Purchase Agreement is attached hereto as Exhibit 2.

34.     The FFMER 2007-4 Trust was established pursuant to the PSA, dated as of June 1, 2007, and entered into by and among MLMI as Depositor; Home Loan as Servicer; and LaSalle Bank National Association as trustee.  A true and correct copy of the PSA is attached hereto as Exhibit 3.  U.S. Bank was subsequently appointed as successor-trustee and currently serves as Trustee of the Trust.

35.     Each of the Purchase Agreements and PSA attaches Exhibits and/or Schedules and reference integrated agreements (collectively, the "Trust Agreements").[3]  All covenants and agreements made therein with respect to the Mortgage Loans and the other property constituting the Trust Fund were made for the benefit of the Certificateholders.

---

[2]     The Settlement Agreement entered into between Bank of America and DOJ defines "Merrill Lynch" as MLPFS, MLML, and MLMI as well as their current and former subsidiaries and affiliates.  *See* Settlement Agreement *available at* https://www.justice.gov/iso/opa/resources/3392014829141150385241.pdf.

[3]     Capitalized terms used and not defined herein shall have the meanings ascribed to such terms in the Trust Agreements.

36.     Pursuant to the PSA, MLMI conveyed to the Trustee its rights, title, and interest in—and to—the assets of the Trust Fund, which included, among other things, approximately 7,600 Loans with an aggregate principal balance of approximately $1.6 billion as of June 1, 2007.

37.     The Trust issued approximately $1,547,200,100 in certificates (the "Certificates"), which were marketed and sold to investors via, among other things, a prospectus supplement dated June 25, 2007 (the "Prospectus Supplement").  A true and correct copy of the Prospectus Supplement is attached hereto as Exhibit 4.

38.     As set forth in the PSA, the Trustee accepted the Trust Fund on behalf of the Trust and, among other things, was assigned (solely in its capacity as Trustee) MLMI's Depositor rights under the Purchase Agreements from and after the Closing Date.  MLMI's Depositor rights and benefits pursuant to the Purchase Agreements inured to the benefit of the Trust or to the Trustee on behalf of the Trust.

39.     Upon conveyance of the Mortgage Loans to the Trust, MLMI assigned to the Trustee certain of its rights with respect to the Mortgage Loans, including its right to enforce the Mortgage Warranties made in the Purchase Agreements.  The Trustee was authorized in certain circumstances to enforce those rights for the benefit of the Trust and the Certificateholders.

III.    **THE RIGHTS OF THE TRUSTEE TO PROTECT THE TRUST AND THE INTERESTS OF CERTIFICATEHOLDERS**

A.    **The Trustee Has Authority To Enforce The Mortgage Warranties**

40.     Pursuant to the PSA, the Trustee has the authority to exercise MLMI's rights against the Sellers under the Purchase Agreements, including the right to enforce the Mortgage Warranties against First Franklin and MLML.

41.     Section 2.01 of the PSA provides that:

The Depositor, concurrently with the execution and delivery hereof, does hereby
sell, transfer, assign, set over and convey to the Trustee without recourse all the
right, title and interest of the Depositor in and to the assets of the Trust Fund.

42.     Pursuant to Section 2.01 of the PSA, MLMI also assigned to the Trustee MLMI's

"right, title and interest in the [Mortgage Warranties] contained in the [Purchase Agreements]."

Specifically, Section 2.01 of the PSA provides that:

[T]he Depositor does hereby convey, assign and set over to the Trustee for the
benefit of the Certificateholders its rights and interests under the [Purchase
Agreements], including the Depositor's right, title and interest in the
representations and warranties contained in the [Purchase Agreements] and the
benefit of the repurchase obligations and the obligation of the related Seller
contained in the [First Franklin] Purchase Agreement or the MLML Purchase
Agreement, as applicable, to take, at the request of the Depositor or the Trustee,
all action on its part which is reasonably necessary to ensure the enforceability of
a Mortgage Loan.

43.     Thus, once the Loans were securitized in the Trust, First Franklin and MLML

owed their obligations under the Purchase Agreements, including compliance with the Mortgage

Warranties, to the Trust, with the Trustee empowered to enforce such obligations on behalf of

the Certificateholders.

**B.  The Mortgage Warranties**

44.     In connection with First Franklin's and MLML's sale of the Loans to MLMI

pursuant to the Purchase Agreements, First Franklin and MLML made various Mortgage

Warranties in Section 7.02 of their respective Purchase Agreement with respect to each

Mortgage Loan for the benefit of MLMI and the Trust.

45.     The Purchase Agreements also required each of First Franklin and MLML,

respectively, to ensure that there were neither missing nor defective Mortgage Loan Documents

associated with the Mortgage Loans.

46.     The Mortgage Warranties were and are material to the Trust and the Certificateholders.  Through the Mortgage Warranties, each of First Franklin and MLML guaranteed, among other things, that the Mortgage Loans met certain credit quality thresholds that indicated that borrowers would be able to repay their Loans on time and in full, that the Loans were originated in compliance with legal requirements, and that the originators had the documentation required to issue the Loans.  On information and belief, without these assurances, the Loans would not have been purchased and securitized in the Trust, or at the very least, would not have been purchased for the price paid.

47.     Moreover, the detail and breadth of the Mortgage Warranties (as well as the associated Cure/Repurchase Obligation) were critical and necessary for the marketing of the Trust certificates as, generally, investors in the Trust had no access to the Mortgage Loan files prior to the formation of the Trust or the sale of the certificates.  Indeed, without the assurances contained in the Mortgage Warranties and each of First Franklin's and MLML's unambiguous Cure/Repurchase Obligation for Defective Loans, described below, the inability of investors and rating agencies to conduct due diligence on the Mortgage Loans (as both a practical matter and as per the relevant Trust Agreements) would have rendered the certificates all but unmarketable.

**C. First Franklin's and MLML's Cure/Repurchase Obligation**

48.     First Franklin and MLML accepted the risk that, if the Mortgage Loans failed to comply with the Mortgage Warranties, they—not the Trust or Certificateholders—would bear the consequences.

49.     With respect to every Mortgage Loan that breaches one of the Mortgage Warranties made in the Purchase Agreements in a way that materially and adversely affects the value of a Mortgage Loan, the related Seller is contractually obligated to cure the breach or

repurchase the breaching Loan within 60 days of the earlier of discovering or receiving notice of the breach.

      50.    Specifically, First Franklin and MLML agreed in the Purchase Agreements that:

> Within sixty (60) days of the earlier of either discovery by or notice to the Seller of any breach of a representation or warranty which materially and adversely affects the value of a Mortgage Loan or the Mortgage Loans, the Seller shall use its best efforts promptly to cure such breach in all material respects and, if such breach cannot be cured, the Seller shall repurchase such Mortgage Loan at the Repurchase Price.  In the event that a breach shall involve any representation or warranty set forth in Subsection 7.01 and such breach cannot be cured within sixty (60) days of the earlier of either discovery by or notice to the Seller of such breach, all of the Mortgage Loans shall be repurchased by the Seller at the Repurchase Price.

(Purchase Agreements § 7.03.)

      51.    Section 2.03 of the PSA also provides that each Seller must provide "prompt written notice" upon discovery of a breach of a Mortgage Warranty.

      52.    Section 2.03(c) of the PSA provides a mechanism for the enforcement of each of First Franklin's and MLML's Cure/Repurchase Obligation for the benefit of the Trust and the Certificateholders and also details the Sellers' contractual obligation to provide prompt written notice to the Trustee (among other parties) upon their discovery of a Defective Loan, also for the benefit of the Trust and the Certificateholders:

> Upon discovery by any of the NIMs Insurer, the Depositor, the Servicer, the Seller or the Trustee (or its custodian) of a breach of any of such representations and warranties that adversely and materially affects the value of the related Mortgage Loan, Prepayment Charges or the interests of the Certificateholders, the party discovering such breach shall give prompt written notice to the other parties. Within ninety (90) days of the discovery of such breach of any representation or warranty, the Depositor shall cause the related Seller to either (a) cure such breach in all material respects, (b) repurchase such Mortgage Loan or any property acquired in respect thereof from the Trustee at the Purchase Price[.]

**IV.   LOANS BREACHING THE MORTGAGE
       REPRESENTATIONS PERVADE THE TRUST**

53.    Based upon the Statement of Facts, on information and belief, following ML's

acquisition of First Franklin, when First Franklin securitized loans, different ML subsidiaries,

including MLML, had a practice of reviewing some portion of the loans being securitized.  In

light of this practice, and given the number, severity, and nature of the breaches of Mortgage

Warranties uncovered by the Certificateholders' investigations, it is likely that this review of the

pools from which the Mortgage Loans were drawn revealed to First Franklin and/or MLML at

least some of the same problems as those identified in the Pre-Complaint Breach Notices.  It is

also likely that First Franklin and/or MLML knew that Defective Loans were securitized in the

Trust and that such Defective Loans are pervasive in the Trust.

54.    In or around August 2014, the DOJ concluded its investigation into the roles

that First Franklin, ML, and BAC played in the housing and financial crises.  As DOJ found,

and as BAC publicly acknowledged on behalf of First Franklin, ML, MLML, and itself:

> With [Merrill Lynch's] acquisition of originator First Franklin in December 2006,
> Merrill Lynch vertically integrated all significant aspects of its RMBS business,
> from origination through securitization.  This integration gave Merrill Lynch
> greater visibility into First Franklin's loan origination practices.  Following its
> acquisition of First Franklin, Merrill Lynch sometimes reviewed a smaller due
> diligence sample when securitizing First Franklin loans than it had when
> acquiring and securitizing loans from First Franklin prior to the acquisition.  In an
> email, one Merrill Lynch employee stated that certain post-acquisition First
> Franklin loans were being securitized "without the equivalent of a whole loan due
> diligence" and as a result "valuation and other credit kickouts will not occur" to
> the same extent as prior to the First Franklin acquisition.  Moreover, for a period
> of time in 2007, Merrill Lynch gave its wholly owned subsidiary First Franklin
> the authority in certain circumstances to make the final decision about what First
> Franklin loans should be waived in and securitized.  For example, according to a
> May 2007 report, the due diligence vendor graded 7% of the loans in one sample
> of First Franklin loans EV3 and 58% of those loans were waived into the purchase
> pool.  Most of these loans were ultimately securitized by Merrill Lynch.

(Statement of Facts at 5.)

55.     As DOJ further found—and as BAC further acknowledged on behalf of First
Franklin, ML, MLML, and itself—MLML's third party vendors found severe underwriting
and compliance issues in a sizeable percentage of the loans it reviewed during the 2006 to
2007 period, which includes the time period when the Mortgage Loans in this Trust were
securitized.  Despite finding significant problems in the due diligence samples it reviewed,
"[MLML] typically did not review the unsampled portion of the loan pools to determine
whether they also included loans with material credit or compliance defects."  (*Id.* at 3.)

56.     In other words, MLML sampled the loan pools First Franklin was
securitizing, reviewed the samples, learned from the reviews that the loan pools were rife
with Defective Loans, and then left unsampled Defective Loans in the loan pools that were
securitized.  As BAC admitted on behalf of First Franklin, ML, MLML and itself, "reports
showed that some due diligence samples had an EV3 rate as high as 50% of the loans
sampled."  (*Id.*)  This was a significant flaw because:

> Vendors graded a loan an EV3 when the loan was not originated in
> compliance with applicable laws and regulations, the loan did not comply
> with applicable underwriting guidelines and lacked the sufficient offsetting
> compensating factors, or the loan file was missing a key piece of
> documentation.

(*Id.*)

57.     For example, an email sent by one of the consultants in MLML's due diligence
department stated "[h]ow much time do you want me to spend looking at these [loans] if [the co-
head of Merrill Lynch's RMBS business] is going to keep them regardless of issues? . . . Makes
you wonder why we have due diligence performed other than making sure the loan closed."  (*Id.*)

58.     The Statement of Facts also contains BAC's acknowledgement on behalf of
First Franklin, ML, MLML, and itself that:

> Merrill Lynch hired third-party valuation firms to test the reasonableness of the appraised values of mortgaged properties.  These checks were performed through a variety of methods that generated valuation estimates, including (i) "automated valuation models," or "AVMs," (ii) desk reviews of the appraisals by licensed appraisers, and (iii) broker price opinions.  After reviewing the relevant data, the valuation firm would provide its results to Merrill Lynch.  Merrill Lynch had an internal "tolerance" of 10 to 15%.  As a result of this practice, Merrill Lynch accepted certain loans for purchase and securitization where the reported appraised value at the time of origination was as much as 10 to 15% higher than the valuation firm's estimated value of the property.  In addition, some of the RMBS issued by Merrill Lynch potentially contained loans with an LTV in excess of 100%, based on valuations obtained from AVMs.  The offering documents did not disclose facts about Merrill Lynch's "tolerance" levels.

(*Id.* at 5-6.)

59.     On March 22, 2007, L. Andrew Pollock, then President and Chief Executive Officer of First Franklin, testified publicly before the United States Senate's Committee on Banking, Housing, and Urban Affairs to address "the state of the subprime mortgage industry." (*See* Statement at the Hearing on the Subprime Mortgage Market Before the Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (Mar. 22, 2007) (statement of L. Andrew Pollock, President & CEO, First Franklin Financial Corporation), *available at* https://www.banking.senate.gov/imo/media/doc/ACF45B0.pdf.)  In doing so, Mr. Pollock held First Franklin out to the public as a responsible mortgage loan originator in ways that BAC's subsequent admissions in the Statement of Facts showed were untrue.  Thus, for example, Mr. Pollock assured the public of First Franklin's "proven history as a responsible lender," which Mr. Pollock asserted was due to "the disciplined underwriting we embrace as a company."  Mr. Pollock further asserted that "we employ underwriting standards that assure the quality of the loans we originate," and that "[t]here underwriting standards are designed to ensure that borrowers can afford to repay the mortgages we originate, as well as those we have originated in recent years."  (*Id.* at 2.)  Mr. Pollock further asserted that First Franklin did not "make loans based solely on collateral value; specifically, all loans are underwritten based on the applicants[']

credit history and ability to repay the debt." (*Id.* at 3.) Mr. Pollock also assured the Senate that "First Franklin's 25 years of industry experience and our commitment to responsible lending standards has allowed us to weather the current difficult situation, and will enable us to continue to succeed in the future." (*Id.*) As part of its settlement with DOJ, BAC—on behalf of, *inter alia*, First Franklin—effectively admitted that these statements were false.

60.     On or about September 2, 2011, the Federal Housing Finance Agency ("FHFA") filed a securities action against First Franklin, ML, MLML, and certain of their affiliates and executives concerning 72 RMBS offerings in which Fannie Mae and Freddie Mac had invested, including the Trust at issue here and four other RMBS trusts that First Franklin had sponsored. FHFA's review revealed that, for each securitization at issue, including those sponsored by First Franklin, the representations made regarding certain loan characteristics were materially inaccurate. In eventually settling these and other claims by FHFA, BAC, and related entities agreed to pay $9.3 billion. (*See FHFA v. Merrill Lynch & Co, Inc. et. al.*, No. 11-cv-6202 (S.D.N.Y.); *see also* "FHFA Announces $9.3 Billion Settlement with Bank of America Corporation," FHFA News Release dated March 26, 2014, *available at* https://www.fhfa.gov/Media/PublicAffairs/Pages/FHFA-Announces-$9-3-Billion-Settlement-With-Bank-of-America-Corporation.aspx.)

61.     Moreover, other investors and an RMBS insurer have filed actions against First Franklin and/or its subsidiaries and affiliates, alleging that mortgage loans securitized in First Franklin-sponsored trusts breached representations and warranties based upon the results of forensic reviews of the mortgage loans securitized in those trusts.[4] By way of example, a

---

[4]     *Ambac Assurance Corp. v. First Franklin Financial Corp.*, No. 651217/2012 (N.Y. Sup. Ct. N.Y. Cnty.); *Public Employees' Retirement System of Mississippi v. Merrill Lynch & Co.*, No.

complaint filed by American International Group, Inc. details First Franklin's underwriting process as told by former First Franklin underwriters, one of whom concluded that First Franklin's practices were "basically criminal."  (Complaint at 11, *American International Group, Inc. v. Bank of America Corporation*, No. 652199/2011 (N.Y. Sup. Ct. N.Y. Cnty. Aug. 8, 2011), NYSCEF Doc. No. 2.)

62.    On information and belief, based upon the volume and percentage of Defective Loans identified by the Certificateholders' investigations, as well as the Sellers' practices concerning Defective Loans described above, First Franklin and MLML each knew that Defective Loans were securitized in the Trust from the inception of the Trust.  Notwithstanding each of their express obligations to do so, however, neither First Franklin nor MLML notified the Trustee or other PSA parties regarding these Defective Loans.  Moreover, the types of breaches identified in the Pre-Complaint Breach Notices are substantially identical to the breaches made evident by the government investigations and investor and insurer lawsuits referenced above.

63.    The cumulative impact of each the Sellers' knowing, reckless, or grossly negligent inclusion in the Trust of thousands of Defective Loans completely upsets the reasonable expectations of the parties in providing a Cure/Repurchase Obligation for breaching loans.  If First Franklin and/or MLML had disclosed the true quality of the Loans in the PSA and furnished true and accurate Loan documentation and materials, the purchase and the securitization of the Loans would have been rejected or negotiated on fundamentally different economic terms, or the resulting RMBS would have been rendered unmarketable.

64.    Each of First Franklin and MLML, through misrepresentations and omissions regarding the quality and characteristics of the Mortgage Loans, sought to induce investors—and

---

09-cv-1392 (S.D.N.Y.); *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 08-cv-07508 (S.D.N.Y.).

did induce the Certificateholders—to buy Certificates that each of First Franklin and MLML knew did not meet the representations of quality and were therefore likely to cause significant losses to investors.  In the Prospectus Supplement pursuant to which these Certificates were marketed to the Certificateholders, First Franklin and others, including the Sellers' affiliate MLPFS, which acted as lead underwriter, misrepresented the attributes of the Mortgage Loans in the Prospectus Supplement with full knowledge that investors would rely on those false representations and omissions.

65.     The Sellers' breaches of their duties to notify is grossly negligent, given that they must have previously discovered pervasive problems with the Mortgage Loans, including widespread nonconformity with underwriting guidelines.

## V.     THE SELLERS HAVE FAILED TO COMPLY WITH THEIR CONTRACTUAL CURE/REPURCHASE AND OTHER OBLIGATIONS

66.     Investigations into the Mortgage Loans conducted by Certificateholders revealed that at least thousands of Mortgage Loans do not comply with one or more of the Mortgage Warranties made by each of First Franklin and MLML and that the breaches of the Mortgage Warranties materially and adversely affected and affect the value of the Mortgage Loans.

67.     Promptly upon receipt of the notices from Certificateholders of the existence of Defective Loans, the Trustee sought to enforce each of First Franklin's and MLML's obligations, including each of their Cure/Repurchase Obligation.  The Trustee gave notice to the Sellers (among other parties) of at least thousands of Defective Loans revealed by the Certificateholders' investigations and demanded in the Pre-Complaint Breach Notices that First Franklin and/or MLML either cure the breaches or repurchase the Defective Loans, as follows:

  a.  By letter dated July 25, 2012, the Trustee gave notice to the Sellers (among other parties) that at least 100 Loans breached the Mortgage Warranties and had a

20

material and adverse effect on the value of the Loans and/or the interests of the
Certificateholders therein;

b. By letter dated April 1, 2013, the Trustee gave notice to the Sellers (among other
parties) that at least 863 Mortgage Loans breached the Mortgage Warranties and
had a material and adverse effect on the value of the Loans and/or the interests of
the Certificateholders therein;

c. By letter dated November 8, 2013, the Trustee gave notice to the Sellers (among
other parties) that at least 529 Mortgage Loans breached the Mortgage Warranties
and had a material and adverse effect on the value of the Loans and/or the
interests of the Certificateholders therein;

d. By letter dated November 8, 2013, the Trustee gave notice to the Sellers (among
other parties) that at least 2,232 Mortgage Loans breached the Mortgage
Warranties and had a material and adverse effect on the value of the Loans and/or
the interests of the Certificateholders therein;

e. By letter dated July 30, 2014, the Trustee gave notice to the Sellers (among other
parties) that at least 2,263 Mortgage Loans breached the Mortgage Warranties and
had a material and adverse effect on the value of the Loans and/or the interests of
the Certificateholders therein;

68.     Regardless of the Pre-Complaint Breach Notices, the overwhelming majority of
the Defective Loans have not been repurchased.

69.     Certain of the Pre-Complaint Breach Notices included statements that the
breaches identified therein were indicative of pervasive and unremedied breaches by the Sellers

and demanded the repurchase of Defective Loans in the Trust beyond those identified by loan number in the Notices.

70.     The widespread breaches of Mortgage Warranties revealed in the Pre-Complaint Breach Notices, along with the publicly available facts regarding the Sellers' pre-securitization knowledge of loans with credit exceptions, certain of which are described above, demonstrate that the Sellers were grossly negligent in their performance of (and failure to perform) their contractual obligations.

71.     On information and belief, additional investigation, including analysis of missing or defective documents in the Mortgage Loan files and reunderwriting of the Mortgage Loan files themselves, will reveal substantial additional evidence of breaches throughout the Trust's Loans.  The Trustee specifically reserves the right based upon further investigations to identify additional Mortgage Loans that breach the Mortgage Warranties for which claims will be made.

72.     On information and belief, the breaches of Mortgage Warranties and document defects are likely pervasive throughout the Loans securitized in the Trust and are the result of the Sellers' gross negligence.  As such, there are likely additional Loans in the Trust, beyond those already specifically identified, that do not comply with the Mortgage Warranties.  Given the extent of the Sellers' knowledge and the seriousness and pervasiveness of the breaches, First Franklin's securitization of the Defective Loans, and the Sellers' failure to cure or repurchase the Defective Loans, constitute, at a minimum, gross negligence.

73.     The Sellers' pattern and practice of refusing to abide by their unambiguous obligations to repurchase Defective Loans and to notify the Trustee of Defective Loans is clear evidence that they will each continue to refuse to abide by their contractual obligations to: (i) notify the Trustee of Defective Loans upon Defendants' discovery of such Loans; (ii) cure or

repurchase Defective Loans upon Defendants' discovery of such Loans; and/or (iii) cure or repurchase Defective Loans upon notice to Defendants by the Trustee of such Loans.

74.     The Sellers' breaches and their failures to notify the Trustee of those breaches have had a material and adverse effect on the Loans, the Trust, and its Certificateholders. Accordingly, Plaintiff seeks enforcement of the PSA and the Purchase Agreements compelling the Sellers to specifically perform their contractual obligations to repurchase Mortgage Loans, or otherwise compensate the Trust, with respect to all Defective Loans, including those specifically identified in the Breach Notices as well as those that the Trustee may identify from further re-underwriting, statistical sampling, or other means.

## VI.     DEFENDANTS ALSO ARE LIABLE AS SUCCESSORS-IN-INTEREST AND/OR "ALTER EGOS"

75.     As a matter of law, MLML and BAC became the successors-in-interest to and/or the alter egos of, First Franklin.  At least one court has found that both BAC and ML are successors-in-interest to First Franklin based upon that court's review of a declaration describing ML's acquisition of First Franklin and BAC's subsequent acquisition of ML and its subsidiaries.

76.     Because BAC and MLML are the successors-in-interest to and alter egos of First Franklin, BAC and MLML are jointly and severally liable for the wrongful conduct of First Franklin alleged herein.

77.     As a matter of law, BAC became the successor-in-interest to and/or alter ego of, MLML upon BAC's acquisition of ML, including its subsidiary, MLML.

78.     Because BAC is the successor-in-interest to and alter ego of MLML, and because First Franklin is the alter ego of MLML, BAC and First Franklin are jointly and severally liable for the wrongful conduct of MLML alleged herein.

23

A. **ML Acquires First Franklin and**
   **ML and MLML Assume First Franklin's Liabilities**

79.     ML acquired First Franklin in or around December 30, 2006 as part of a $1.3

billion acquisition from National City Bank.  ML's acquisition of First Franklin was effectuated

through a September 5, 2006 Purchase Agreement by and between ML's MLB&T subsidiary and

National City Bank, which at the time wholly owned First Franklin.

80.     Pursuant to that September 5, 2006 Purchase Agreement, ML, through MLB&T,

purchased assets and assumed the "Assumed Liabilities" specified in that Agreement.  In sum

and substance, the Assumed Liabilities acquired by ML included all the liabilities of First

Franklin, except for certain Retained Liabilities specified by that Agreement.

81.     Following ML's acquisition of First Franklin, ML integrated First Franklin into its

residential mortgage loan origination and securitization platform.  Indeed, in its 10-K Annual

Statement for the period ending December 29, 2006, ML stated that, "on September 5, 2006, we

announced an agreement to acquire the First Franklin mortgage origination franchise and related

servicing platform from National City Corporation.  We expect First Franklin to accelerate our

vertical integration in mortgages, adding scale to our mortgage securitization . . . platform."

82.     After ML acquired First Franklin, ML reported First Franklin's financial results as

part of ML's Global Markets and Investment Banking ("GMI") segment.  And, in ML's 10-K

Annual Statement for the period ending December 28, 2007, Merrill Lynch described First

Franklin's operations as having been "integrated into GMI's mortgage securitization business."

83.     ML subsequently disclosed in its 10-K Annual Statement for the period ending

December 28, 2007 that there was "currently approximately $40 billion of outstanding loans that

First Franklin sold in various asset sales and securitization transactions[.]"  Accordingly, ML

"recognized a liability of approximately $520 million at December 28, 2007 arising from [First

Franklin's] residential mortgage sales and securitization transactions" and relating to its obligations to repurchase defective First Franklin loans.

84.     In or around March 2008, ML announced that it would discontinue all of First Franklin's loan origination activity.  ML further announced that it planned to close its First Franklin subsidiary.  (Paul Jackson, For Merrill, the First Franklin Experiment is Officially Over, HOUSING WIRE (March 5, 2008), *available at* https://www.housingwire.com/articles/merrill-first-franklin-experiment-officially-over.)

85.     On information and belief, subsequent to that 2008 announcement, at ML's direction, First Franklin did in fact cease all lending activity.  Upon ceasing its loan origination activity, First Franklin ceased conducting its ordinary business.

86.     On or about June 2, 2008, MLB&T, acting at ML's direction, transferred First Franklin's stock to another ML subsidiary, MLMSC.  Like MLML and First Franklin, MLB&T and MLMSC were controlled by ML.

87.     Also on about June 2, 2008, when First Franklin's stock was transferred to MLMSC, at ML's direction, First Franklin entered into a separate Representation and Warranty Repurchase Agreement with MLML.  Pursuant to that Representation and Warranty Repurchase Agreement, First Franklin confirmed that it "shall cease all lending activity."  First Franklin and MLML also agreed that MLML would repurchase loans on First Franklin's behalf.  First Franklin and MLML further agreed that First Franklin would not enter into any agreements to repurchase loans and that all payments made for loan repurchases would be made through MLML's bank accounts.

88.     Additionally, as is alleged in a related case, MLML repurchased mortgage loans on First Franklin's behalf in at least one other trust in the same "shelf" as the Trust in response to

25

allegations that First Franklin breached its representations and warranties with respect to mortgage loans in that trust.  Thus, MLML is First Franklin's successor-in-interest and/or alter ego in that it has demonstrated that it considers itself liable for First Franklin's Cure and Repurchase Obligation in similar circumstances.

89.     As further evidence that First Franklin and MLML are alter egos of each other, the aggregate unpaid principal balance of the Mortgage Loans referenced in the First Franklin Purchase Agreement is $1,596,700,166.24 and the aggregate unpaid principal balance of the Mortgage Loans referenced in the MLML purchase agreement is $3,299,857.96.  The Mortgage Loan Schedule ("MLS"), which lists all of the Loans ultimately transferred to the Trust, has an aggregate unpaid principal balance equal to the sum of those two numbers, but lists only First Franklin as a loan seller.  Therefore, the MLS indicates that, at the time the Sellers transferred the loans to the Trust, the Sellers considered themselves one and the same entity.

90.     Subsequent to MLMSC's acquisition of First Franklin, and subsequent to the execution of the Representation and Warranty Repurchase Agreement, ML, in its 10-K Annual Statement for the period ending December 26, 2008, confirmed that it continued to reserve for repurchase liability arising from defective First Franklin loans as "[ML] recognized a repurchase reserve liability of approximately $560 million at December 26, 2008 arising from these First Franklin residential mortgage sales and securitization transactions."

91.     On information and belief, although First Franklin had ceased performing its ordinary business function of originating loans, ML nonetheless continued to operate First Franklin.

92.     On information and belief, after BAC acquired First Franklin through BAC's merger with ML, BAC likewise continued to operate First Franklin even as First Franklin had

ceased performing its ordinary business function of originating loans.  And, upon BAC's acquisition of ML through merger, BAC assumed First Franklin's liabilities that had been held by ML prior to its merger with BAC.

### B.  BAC Acquires ML and Assumes All ML Obligations, Including Those Of Its Subsidiaries, MLML and First Franklin

93.      On or about January 1, 2009, BAC acquired ML and ML's operating subsidiaries and affiliates, including First Franklin and MLML, through an all-stock merger.  BAC accomplished this acquisition by merging ML into a wholly-owned subsidiary of BAC that was formed solely for the purpose of the merger, with ML as the surviving corporation and a wholly-owned subsidiary of BAC, and First Franklin and MLML as wholly-owned indirect subsidiaries of BAC.

94.      Through this merger, BAC acquired substantially all of ML assets and responsibility for all of ML's pre-merger liabilities.  (*See* Agreement and Plan of Merger by and between ML and BAC dated as of September 15, 2008; *see also* BAC Proxy Statement, Schedule 14A (describing the terms of the "strategic business combination")).  The merger was intended to qualify as a "reorganization" within the meaning of Section 368(a) of the Internal Revenue Code of 1986.

95.      Upon completing the merger with ML, BAC announced in a press release that the merger resulted in a "new organization," and that BAC had assumed *all of* ML's obligations: "[BAC] assumed all of [ML]'s obligations, including its outstanding U.S. and non-U.S. debt securities, its obligations regarding outstanding trust preferred securities, and its guarantees of both outstanding non-U.S. debt securities issued by its subsidiaries and trading contracts of its subsidiaries."  ("Bank of America Simplifies Corporate Structure" Bank of America Press Release dated Oct. 1, 2013, *available at* https://www.sec.gov/Archives/edgar/data/70858/000007085813000236/bac-exhibit991100113.htm.)

96.     As a result of the merger, ML ceased "separately fil[ing] reports with the U.S. Securities and Exchange Commission" and thereby ceased its ordinary business soon after its merger with BAC was consummated.  (*Id.*)

97.     On information and belief, following the merger, there was continuity of management, personnel, physical location, assets, and general business operations between BAC and ML (and its subsidiaries, including First Franklin, MLML, and MLMI).  Indeed, following the acquisition and merger, BAC engaged in a massive corporate restructuring aimed at integrating ML and its operations into BAC, as part of which, *inter alia*, ML adopted BAC's risk management and governance practices "to maintain consistent risk measurement and disciplined risk taking"; BAC's Corporate Benefits Committee assumed overall responsibility for the administration of all of ML's employee benefit plans; ML qualified retirement and defined contribution plans were closed to new participants and newly hired ML employees who were eligible participated in BAC plans; BAC assumed ML's stock-based compensation plans, and awards under those plans became payable in BAC common stock; BAC began rebranding all of its corporate and investment banking activities under the marketing name "Bank of America Merrill Lynch"; ML's principal executive offices were moved to the Bank of America Corporate Center in Charlotte, North Carolina, which is owned by a BAC subsidiary; ML employees were relocated to the "Bank of America Tower" in New York, New York; ML sold MLB&T to a subsidiary of BAC, and MLB&T was thereafter merged into Bank of America, N.A.; BAC's broker-dealer subsidiary, Banc of America Investment Services, Inc., was merged into MLPFS, with MLPFS continuing as the surviving corporation; BAC's credit ratings became the major driver of ML's credit ratings; and ML and BAC established intercompany lending and borrowing arrangements "to facilitate centralized liquidity management."

98.     On information and belief, in October 2013, ML was absorbed into BAC, with ML ceasing to exist as a separate legal entity.  Upon completion of the merger, BAC assumed all of ML's obligations and liabilities and became the successor-in-interest to ML.  All of ML's federally registered trademarks and service marks were assigned to BAC and BAC retained the "Merrill Lynch" brand name for its retail brokerage and investment bank.

99.     On information and belief, although each of First Franklin, MLML, and MLMI had ceased performing its ordinary business functions long before BAC merged with ML, BAC nonetheless continued to operate each of those entities.

100.    Accordingly, on information and belief, BAC became the successor-in-interest to and the alter ego of First Franklin, ML, MLML, and each of their affiliated entities.  Because BAC is the successor-in-interest to and the alter ego of First Franklin, ML, and MLML, BAC is jointly and severally liable for the wrongful conduct of First Franklin and MLML alleged herein.

## FIRST CAUSE OF ACTION

### (Breach of Contract / Specific Performance Against All Defendants)

101.    The Trustee repeats and realleges paragraphs 1 through 100 above as if fully set forth herein.

102.    The PSA and the Purchase Agreements are valid contracts.

103.    The Trustee is an express party to the PSA and has performed all conditions, covenants, and obligations necessary under the PSA, the Purchase Agreements, and/or related Trust Agreements for the commencement of this action.

104.    Under Section 7.03 of the First Franklin Purchase Agreement, First Franklin agreed that it would cure or repurchase any Defective Loans transferred pursuant to the First Franklin Purchase Agreement.

105.    Under Section 7.03 of the MLML Purchase Agreement, MLML agreed that it would cure or repurchase any Defective Loans transferred pursuant to the MLML Purchase Agreement.

106.    Under the PSA, MLMI assigned to the Trustee MLMI's right to enforce the Mortgage Warranties made by each of First Franklin and MLML in the First Franklin and MLML Purchase Agreements.

107.    The Trustee has provided First Franklin and MLML with notice of Defective Loans and has demanded that they comply with the Cure/Repurchase Obligation by, among other things, providing written demands that they repurchase thousands of enumerated Defective Loans and any other Defective Loans.

108.    Neither First Franklin, nor MLML, nor any of their successors-in-interest nor alter egos have cured or repurchased all of the Defective Loans, in violation of First Franklin's and MLML's express contractual obligations enumerated in but not limited to, the PSA and the Purchase Agreements.

109.    For these and other reasons to be proven at trial, First Franklin and MLML have breached the PSA, the Purchase Agreements, and the related Trust Agreements.

110.    By virtue of the foregoing, First Franklin, and each of BAC and MLML, individually and/or as successors-in-interest and/or alter egos, should be ordered to specifically perform First Franklin's and MLML's contractual obligations under the PSA, the Purchase Agreements, and the related Trust Agreements.

111.    Included among the obligations that First Franklin and MLML and their respective successors-in-interest and alter egos should specifically perform are their contractual obligations to repurchase all of the Defective Loans transferred in the Purchase Agreements,

whether identified thus far by loan number or which further investigation or discovery may uncover.  Where specific performance is unavailable, the Trust is entitled to damages in lieu thereof from Defendants in an amount to be determined at trial for First Franklin's and MLML's breaches of the Cure/Repurchase Obligation.

**SECOND CAUSE OF ACTION**

**(Breach of Contract / Damages Against All Defendants)**

112.    The Trustee repeats and realleges paragraphs 1 through 100 above as if fully set forth herein.

113.    The PSA and the Purchase Agreements are valid contracts.

114.    The Trustee is an express party to the PSA and has performed all conditions, covenants, and obligations necessary under the PSA, the Purchase Agreements, and/or related Trust Agreements for the commencement of this action.

115.    Under Section 7.03 of the First Franklin Purchase Agreement, First Franklin agreed that it would cure or repurchase any Defective Loans transferred pursuant to the First Franklin Purchase Agreement.

116.    Under Section 7.03 of the MLML Purchase Agreement, MLML agreed that it would cure or repurchase any Defective Loans transferred pursuant to the MLML Purchase Agreement.

117.    Under the PSA, MLMI assigned to the Trustee MLMI's right to enforce the Mortgage Warranties made by each of First Franklin and MLML in the First Franklin and MLML Purchase Agreements.

118.    The Trustee has provided First Franklin and MLML with notice of Defective Loans and has demanded that they comply with the Cure/Repurchase Obligation by, among other

things, providing written demands that they repurchase thousands of enumerated Defective

Loans and any other Defective Loans.

119.    Neither First Franklin, nor MLML, nor any of their successors-in-interest nor alter

egos have cured or repurchased all of the Defective Loans, in violation of First Franklin's and

MLML's express contractual obligations enumerated in but not limited to, the PSA and the

Purchase Agreements.

120.    For these and other reasons to be proven at trial, First Franklin and MLML have

breached the PSA, the Purchase Agreements, and the related Trust Agreements.

121.    On information and belief, Defective Loans are likely pervasive throughout the

Loans securitized in the Trust and are the result of each of First Franklin's and MLML's gross

negligence.  Specifically, the Trust's damages are caused by First Franklin's and MLML's

knowingly—or at the very least grossly negligently—including Defective Loans in the Trust

when they knew or should have known that such Loans were and are Defective Loans.

122.    By virtue of the foregoing, the Trust is not limited to a contractual repurchase

remedy.  This is particularly true where, as here, each of First Franklin, MLML, and their

successors-in-interest and alter egos have frustrated the implementation of that remedy by

concealing their knowledge of those breaches.

123.    Accordingly, the Trust is entitled to damages for breach of contract in an amount

to be determined at trial.

## THIRD CAUSE OF ACTION

### (Failure to Notify / Specific Performance Against All Defendants)

124.    The Trustee repeats and realleges paragraphs 1 through 100 above as if fully set

forth herein.

125.    The PSA and the Purchase Agreements are valid contracts.

126.    The Trustee is an express party to the PSA and has performed all conditions, covenants, and obligations necessary under the PSA, the Purchase Agreements, and/or related Trust Agreements for the commencement of this action.

127.    Under Section 7.03 of the First Franklin Purchase Agreement, First Franklin agreed that it would cure or repurchase any Defective Loans transferred pursuant to the First Franklin Purchase Agreement.

128.    Under Section 7.03 of the MLML Purchase Agreement, MLML agreed that it would cure or repurchase any Defective Loans transferred pursuant to the MLML Purchase Agreement.

129.    Under the PSA, MLMI assigned to the Trustee MLMI's right to enforce the Mortgage Warranties made by each of First Franklin and MLML in the First Franklin and MLML Purchase Agreements.

130.    On information and belief, First Franklin, MLML, and their successors-in-interest and/or their alter egos discovered before and after the Closing Date that there were Defective Loans in the Trust, but failed to give notice of any breach to the Trustee.

131.    For these and other reasons to be proven at trial, First Franklin and MLML have breached the PSA, the Purchase Agreements, and the related Trust Agreements.

132.    Each Defendant as successors-in-interest and/or alter egos, should be ordered to specifically perform First Franklin's and MLML's contractual obligations under the Purchase Agreements and the related Trust Agreements.

133.    Included among the obligations that Defendants should specifically perform are First Franklin's and MLML's contractual obligation to repurchase all of the Defective Loans they transferred in the Purchase Agreements, whether identified thus far by loan number or

which further investigation or discovery may uncover.  Where specific performance is

unavailable, the Trust is entitled to damages in lieu thereof from Defendants in an amount to be

determined at trial for First Franklin's and MLML's breaches of the Cure/Repurchase

Obligation.

## FOURTH CAUSE OF ACTION

### (Failure to Notify / Damages Against All Defendants)

134.    The Trustee repeats and realleges paragraphs 1 through 100 above as if fully set

forth herein.

135.    The PSA and the Purchase Agreements are valid contracts.

136.    The Trustee is an express party to the PSA and has performed all conditions,

covenants, and obligations necessary under the PSA, the Purchase Agreements, and/or related

Trust Agreements for the commencement of this action.

137.    Under Section 7.03 of the First Franklin Purchase Agreement, First Franklin

agreed that it would cure or repurchase any Defective Loans transferred pursuant to the First

Franklin Purchase Agreement.

138.    Under Section 7.03 of the MLML Purchase Agreement, MLML agreed that it

would cure or repurchase any Defective Loans transferred pursuant to the MLML Purchase

Agreement.

139.    Under the PSA, MLMI assigned to the Trustee MLMI's right to enforce the

Mortgage Warranties made by First Franklin and MLML in the Purchase Agreements.

140.    On information and belief, First Franklin, MLML, and their successors-in-interest

and/or their alter egos discovered before and after the Closing Date that there were Defective

Loans in the Trust, but failed to give notice of any breach to the Trustee.

141.    For these and other reasons to be proven at trial, First Franklin and MLML have breached the PSA, the Purchase Agreements, and the related Trust Agreements.

142.    On information and belief, Defective Loans are likely pervasive throughout the Loans securitized in the Trust and are the result of each of First Franklin's and MLML's gross negligence.  Specifically, the Trust's damages are caused by First Franklin's and MLML's knowingly—or at the very least grossly negligently—including Defective Loans in the Trust when they knew or should have known that such Loans were and are Defective Loans.

143.    By virtue of the foregoing, the Trust is not limited to a contractual repurchase remedy.  This is particularly true where, as here, First Franklin, MLML, and their successors-in-interest and alter egos have frustrated the implementation of that remedy by concealing their knowledge of those breaches.

144.    As a result of the failure of each of First Franklin, MLML, and their successors-in-interest and alter egos to provide notice of Defective Loans and defective Loan files, the Trust also is entitled to damages for breach of contract in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE the Trustee respectfully requests that the Court enter judgment granting the relief, including without limitation the following:

a.   Specific performance against all Defendants of each of First Franklin's and MLML's contractual obligations under the PSA, the Purchase Agreements, and related Trust Agreements, including without limitation requiring each of First Franklin, MLML, and BAC, including in each of their capacities as successors and/or alter egos as appropriate, to repurchase all Defective Loans;

b.   Damages against all Defendants in an amount to be determined at trial;

c. Pre-judgment and post-judgment interest at the rates prescribed by law;

d. Reimbursement of the Trustee's costs and expenses, including reasonable attorneys'

fees and expert fees; and

e. All other relief at law or in equity, including but not limited to punitive damages if

and to the extent supported by the evidence, to which the Trustee, on behalf of the Trust, may be

entitled.

Dated: New York, New York
      June 25, 2019

MCKOOL SMITH, P.C.

By: _____

      Christopher P. Johnson
      Gayle R. Klein
      Zachary W. Mazin
      Jared S. Siegel
One Bryant Park, 47th Floor
New York, New York 10036
cpjohnson@mckoolsmith.com
gklein@mckoolsmith.com
zmazin@mckoolsmith.com
jsiegel@mckoolsmith.com
Tel: (212) 402-9400
Fax: (212) 401-9444

*Attorneys for Plaintiff*